Good morning, your honors. May it please the court, my name is Joseph Briel, and I represent appellants. I'm here today with my associate, Jill Diamond, and I'd like to reserve five minutes for rebuttal. Today, we are here on this appeal because of misapplications of law by the district court on their denial of my client's preliminary injunction. The misapplications were both in the preliminary injunction test that was applied, as well as the substantive law and substantive legal analysis that the court applied. First, regarding the test, the court did announce the winter factors, and then talked about the serious question test. And the court then used the term to determine whether there was a serious question, whether there was a substantial case for relief. That was a test that the district court used, and that is not the appropriate test in this circuit. The appropriate test is a fair chance of success on the merits. Matter of fact, the court has said it's not a promise of certainty. It's not even a probability of success. And really, what the district court did was use a probability of success standard. Assume you're right for a moment. I'm not sure that's what the district court did, but let's assume you're right. The district court also found that your clients hadn't demonstrated substantial harm or even a possibility or likelihood of proving irreparable harm during the preliminary injunction. So it was only during this stage of the case. Are you asking us to find that the judge abused his discretion in finding that there was an insufficient showing of irreparable harm? Your Honor, I'm actually not asking you to do that, because I don't believe that was the finding. The reason why this is important, but I do want to go to the jury. There's a direct statement in the judge's ruling saying, in effect, I mean, I think directly, that you haven't met your burden of showing irreparable harm. And what I'm saying is, because this is a weighted scale, and it's a sliding scale, when you put the weight wrong to begin with, you can't slide to determine whether there was harm. And what the court actually said was, I don't need to find if there was harm, because what the court said was that you Because you've lost on your merits, he said. But then he went on to say, but I don't need to find it, but I find there isn't any. No, actually, I believe what the court said. The court recognized that constitutional violations under Elrod constitute clear harm, that they make it. They meet the standard. And the court put this in its order. They decided, Elrod said, that is the standard for irreparable harm. I don't need to go there. I don't need to weigh that, because you haven't met your test of a reasonable, serious question. I want to ask you a question about the parties in this case. Your clients seek the ability to possess and use shark fins in the state of California, correct? That is correct. They're all California located. They don't, as I read the pleadings, they don't seek the ability to ship shark fins out of California to other states. Am I right about that? Actually, actually, that is not completely correct. There was evidence presented that members also are wholesalers, retailers, who ship in and ship out on distribution. Was there evidence of the volume of that kind of distribution? There wasn't. Well, there was not evidence of the volume of distribution. There was evidence that livelihoods would end, because these people, that's what they traded in. Now, I'm trying to focus on the interstate commerce claim, and I'm trying to figure out whether your particular clients claim harm because they can't use shark fins within the state of Arizona, or whether your clients also claim harm because they can't use shark fins to be shipped out of the state. And I said Arizona, not California, of course. No, no, and that's fine, Your Honor, I understand. And the purpose, what they're claiming, and what we believe was misapplied under the interstate commerce was that it was both in-state and extraterritorial, because they did not have the ability to distribute, whether from outside in or inside out, because there were wholesalers and retailers who said, basically, my entire business is moving shark fin. OK, now, thank you, that's helpful to me, because I want you to focus on part of your claim. With respect to those plaintiffs who only seek to use shark fins within the state of California, what's your interstate commerce claim? The interstate commerce claim there is that this is a bar for use there. I mean, the test on interstate commerce is, is it a roadblock for moving it into the state, for their use of it in the state, and they're moving it within the state, because they, it's not only use, they're not only using it in the state, but some of these people, if you look at the record below, were store owners that had three or four stores here in Southern California. No, I understand the harm that they suffer from the van. My question is, how can you have an interstate commerce claim with respect to plaintiffs whose sole desire is to use shark fins inside the state of California? And I believe if, well, one is that that is part of the plaintiff class, part of the plaintiff association, but it's not all. But even for that part, they're denied their ability to take it, to take this piece of commerce from the ocean, the EEZ, the federal waters, into the state. There's a roadblock put up, which actually violates the Magnuson Act and the whole purpose of that act. And I don't want to jump ahead to the supremacy issue, but the whole purpose of that congressional act, commercial fishing is defined as moving fish and fish parts into commerce. So it's stopping that commerce in the state. I do want to, before we go there, to talk about the misapplication of the substantive law on the equal protection claim as well. The Court, in its decision, although the Court recognized that this facially neutral statute has a disparate impact on the Chinese, that's part of the EEZ, it went on to say that it did not find discriminatory intent. And although it cited plaintiff's evidence, it went on to say that there was no direct evidence that any person in the legislature or the legislature itself said they were targeting the Chinese. There was no direct evidence. And because of that, it said, didn't meet the standard. And that is simply a misapplication of the law of the circuit. The law of the circuit under EEZ, that you can use indirect evidence. And a matter of fact, under the Derensburg ruling, it actually cites out the type of indirect evidence that a court is supposed to consider. So is it your contention that this law was adopted with a racial animus? There my intent, my position is that there was a discriminatory purpose. You don't have to have. Well, that's why I think we're saying the same thing. Your contention is that this law was adopted with the purpose of discriminating against Chinese Americans. No. We're actually not completely saying the right thing, because the Court has said that legislatures pass laws for many purposes. This is in Arlington Heights. It talks about the fact that there's all sorts of competing purposes, and that's fine, but there can't be a – there can't be hidden in there a discriminatory  And, matter of fact, Arlington Heights goes on to say that you can have a – that it, you know, it doesn't have to be an evil purpose. I understand, but I understand, but I'm still not sure I've got an answer to my question. No, I – Whether it's hidden in there or the only purpose, you're suggesting that one of the purposes of this law was to discriminate against Chinese Americans. I am. I'm saying that – Tell me why the district judge abused his discretion in finding that that was not the case. Okay. And what I'm saying is that by refusing to follow the legal standard of accepting indirect evidence – Well, but does he have to accept the evidence? That's – I don't – I didn't see any indication in this case that the district judge said, yeah, you've given me these statements from legislators. I'm not sure what they prove. You've given them to me, but I refuse to consider them. The judge – you put the evidence in front of the judge, and the judge said, I don't conclude that this law was adopted with a discriminatory purpose, direct or indirect. Why isn't – why isn't that a finding that we have to give deference to? And the reason is the court didn't say that. The court didn't say – Well, isn't that a fair reading of what the court said? I don't – I don't think so. I think the court, in its order, said that I – I will not – I do not find discriminatory intent because there's no direct statements. That's what the court said. There was no direct targeting. And under – And you've got a statement of at least one representative that uses – that said – that uses the word Chinese. I mean, I'm not sure that statement shows direct targeting as much as it shows a recognition of who the impact would be on. Well, no. Let me just go over what the record was for the indirect statements. There was a direct – there was a statement of the sponsor, which is what Derensburg says you should look at, saying this practice, the Chinese drinking this soup, is abhorrent, and it's similar to other ancient cultural practices of the Chinese, like foot binding. And that went the way into the dustbin of history, and so should this. You have the supporters saying we can't police the seas, but we can police Chinatown. You have the statements that we need to target the market. The market is the Chinese market. Those are the only people that are using the product. So even the court said this – the court's order was this was to target the market. So there was this evidence, all of this evidence. So the court didn't say, I'm going to use the Validad standard of indirect evidence. I recognize it. I look at this as indirect evidence, but it's not enough. There wasn't a weighing of the evidence. What the court said, that's anecdotal. I don't need to look at that. I'm only going to look at the fact that there was no direct targeting. And that's where I think there's a problem with the legal analysis here. It's not the matter – if the court did what you said, if a fair reading is she can consider it indirect evidence, she weighed it, she said there's just not enough. It doesn't meet the Derensburg test of what you need to have. Then, Your Honor, yeah, I would be here and I'd say we're out on a limb. But we're not out on a limb here. We're dealing with an order that doesn't acknowledge what the evidentiary standard is, doesn't use that evidentiary standard in weighing the evidence. And that's why I think this Court has to direct that that be done in this case. And the reason I'm having some difficulty with that argument is I take it what you're saying is if the California legislature could have enacted this law without violating equal protection, but some of the people who sponsored it said bad things, and therefore it does violate equal protection. Well, I'm saying two things. That's not – so if – this was just to determine whether or not there was discriminatory intent. Right. The Court already found or acknowledged a desperate impact. When you put those together, then the Court has to say, look, there is a discriminatory purpose here. Now the Court can go on and say, was this narrowly tailored? And I think, you know, as I've put into our briefs, it doesn't meet the narrowly tailored test. They certainly could have more narrowly tailored this ban to prevent what they said they wanted to prevent and still allow my clients, their cultural practices, not run afoul of the Magnuson Act and the conflict preemption issue, which we should talk about next. Because, again, there's another issue on this order. But I'm interested in what you just said. Now, if it should have been more narrowly tailored, in your view, what should the district court have done? Tell me what the district court's order should have been more narrowly tailored. Well, I think what the district court should have done was acknowledge that there was an equal protection problem, that there was a discriminatory purpose, then determine whether or not this could have been more narrowly tailored. Yeah, but that's my question. They needed to review the ban under strict scrutiny. They didn't. This order doesn't do that. No, I understand all the legal arguments you're making. My question is, you're saying the district court should have entered a more narrowly tailored order. Well, no. My question is, what more narrowly tailored order, in your view, would have been  Okay. And what I think what the court should have done was upheld the preliminary injunction on the ban going into effect, and told the legislature, look, if you wish to stop the importation of shark fins that were finned from Indonesia or from the Central America, from countries that do not have finning laws, like we do, like the EU does, then you need to write a ban saying we will stop the importation of shark fins from those countries. Doesn't the California statute cover those? The problem with the California statute is it's too broad. No, so that's what I'm asking again. You're saying that part of the California statute is okay. So tell me what part is okay. Well, no, it doesn't cover the – I mean, it's a blanket ban. So its coverage of some things is okay. Actually, those already are not allowed, are not to be allowed to be covered. The California statute is not supposed to be allowed to come in under the Magnuson Act or the Lacey Act. Right, but there's no – the Magnuson Act says California can enact its own regulations, too. So my question – But no, the Magnuson Act doesn't – But my question is a simple one. Is there any part of the California law that, in your view, should survive the preliminary injunction here? No, I think it needs to be rewritten. And the district court's job was not to rewrite the California ban. No, I agree. But there's a – California has written a law that entirely bans this practice. And I suppose the district court could say, well, to some extent, what you've done is unconstitutional, and therefore, I'm not going to allow it. But to some extent, what you've done is fine. And my question is, is that possible here? No, I don't think it is, because it doesn't – So even to the extent that the law applies to shark fins ripped off in Indonesia or someplace else, the law can't be enforced in California? Well, the problem is it doesn't list the type of fins or those countries. That's not – that's not what 2021 of the Fish and Wildlife Code does. It simply says, ban all – all products, ban. So you can't – the Court couldn't take a meat cleaver and say, this part's okay because it only restricts importation from certain countries, this part's bad because it covers the whole rest of the universe. It's only a whole rest of the – it's the rest of the universe type of ban. So although the Court could have said, and I think under strict scrutiny, the Order should have said, you could have written a law that does this, in essence, telling the legislature, if you want to go back to the table and – and create a ban that doesn't have a constitutional problem here, this is how you do it. I don't think it's the job of the judiciary to say, I'm going to cut that up for you. You know, you've got about two and a half minutes. I understand that. I do want to cover the preemption issue. All right. Thank you, Your Honor, because, again, the Court has a legal – the legal problem with the Court's order was it – it actually dealt with the – with the preemption issue, and it said – it came out basically where no circuit has come before. It said there was no conflict between this ban and the Magnuson Act, and it said the Magnuson Act deals with catching sharks in federal waters and landing sharks in federal waters only. This act doesn't – isn't a shark-finning act. It's not an act meant to – how you catch a – how you humanely catch a shark. It says it's stopping the marketplace. It also talked about the state savings clause. None of that applies, and we have federal decisions in other circuits. The Ninth Circuit hasn't looked at this yet, hasn't – I believe it's an issue of first impression here, but where the Magnuson Act conflicted with local ordinances similar – they weren't the same, but they were similar, and the Mosbacher case, I think, is the closest, where the Court said, look, you can't tell these fishermen that they can catch this, but then they have to comply with state laws, says they can't sell it. That is a conflict – the state laws will not prevail in that conflict. The MSA must prevail in that conflict. And that's not just my client, the appellant's position, but that's the agency's position. The agency's position wasn't presented to the district court, was it? To the extent – the agency wasn't at the district court. Right. But this argument was presented to the district court. Well, that's my question. Was that argument presented – as I read the district court record, the argument was slightly different. The argument was that because it's legal to take them – these certain types of sharks under the MSA, it's legal to sell them in California. But was the argument made that this would conflict with the MSA because it would discourage fishermen from taking their quota of allowed sharks? It was a similar argument. The issue – the legal issue – No, I'm saying the legal issue was raised. A conflict was raised. I find the government's argument interesting, but I went back in the district court record and didn't see that it was made there by any of the parties. And I'm wondering whether or not, however we end up today, it's more appropriate for the district court to consider that argument on remand. Well, and it may be, although I do believe that under the U.S. decision of Ye Vercitti of Escondido, the Court can, you know, consider this argument and can actually make a ruling on this argument instead of saying, I don't want to touch this, send it back down. They can put their – their fingerprints on this issue, and I think it would really – it would help to get a determination because the fact is that under the Chili's case, the Moshbach case, and the city of Charleston case, there's a lot of evidence which were cases where the agency was at least there – it was the similar position of the agency in those cases, the similar argument regarding the MSA and commerce that I think it's clear, and I think it's a clear misapplication of law by the district court, and I just think it could be rectified right here. Thank you. And I do think that the commerce – Can I save your last minute for rebuttal? I was hoping I'd save five minutes for rebuttal, but if I didn't, I will do that. Thank you. Good morning. May it please the Court, Alexandra Robert-Gordon from the Office of the California Attorney General for Defendants Appellees. If it's acceptable to the panel and if it proves doable, I am going to attempt to leave five minutes for intervener counsel, Mr. Henry. To speak. So to reorient us, the question today is whether the district court abused its discretion in denying a preliminary injunction. As a threshold matter, the district court absolutely did not apply the wrong standard. There's no showing here of any kind of irreparable harm or really any immediate harm that would justify the use of a sliding scale. But even if we were to apply it, the district court went on, looked at all of the factors, found that under any formulation of the test, either Winter or Cottrell, that plaintiffs had failed to meet their burden to show that they could succeed really any chance of success on the merits of their claims. And that is absolutely correct. Could every State enact a law similar to California's? I believe that they could, Your Honor. Then if every State did that and the United States, under the Magnuson Act, allowed taking of some sharks, but it turns out that sharks aren't valuable to take unless their fins can be sold, would there be preemption or conflict at that point? I don't believe that there would, Your Honor, because authority under the Magnuson Act doesn't actually extend to creating a market for sharks or for any kind of fish or fish product. I agree, but doesn't the Magnuson Act, because it has, it's looking to maintain a healthy fishery, if you will, says we should be able to take out so many of certain types of sharks because that will help the fishery in general and it will keep it I'm not sure this record establishes that, but I'm just, I'm asking a real hypothetical question. Under those circumstances, would we have a preemption issue? So a few things. One is this record absolutely does not establish that. No, I agree, I agree. Two is, no, I don't think that you would have a preemption issue because the main purpose of the Magnuson-Stevens Act is conservation. And if every State decided to do what California has done, and many States are moving in that direction, because it determined that a market-mediated solution was the most effective way to stop a really horrible practice of thinning, the Magnuson Act doesn't actually extend to that determination of what States decide to do in their market. No, but the government's argument, and it's amicus brief, and I understand that the district court didn't consider this argument. It's a little bit complicated, but the government's argument says we want to maintain this healthy fishery. But they won't do it if they can't sell the fins. So to the extent that they're taking sharks legally in our waters, if you will, they ought to be able to bring them to California and sell the fins. And if they can't do that, then they won't be encouraged to take them. How do you respond to that argument? So I respond to that in a few ways. One is, we don't know that, right? That would be the most sort of fatal sort of thing that's wrong with the government's brief, I would say, is that even assuming that they have any authority, any actually clear and precise federal objective or purpose, and I do not think that they do, you cannot rebut the presumption against preemption. You cannot shut down a duly enacted state law on preemption grounds because the federal government opines that something bad could happen in the future. There could be an effect on something it would like to do in the future. They need to come in here with a very clear analysis, a highly factually driven, clear analysis of what the conflict is, how those two schemes are operating together, and how it is that the state scheme is repugnant, is absolutely in conflict with the federal scheme. We are so far from knowing any of that. There are so many open factual questions, including how California will choose to interpret and implement its regulations. There's really no reason to assume that our ban will have any more of an impact on people's desire to fish for sharks, frankly, than the federal sharks in the hole, than federal law that keeps you from finning. But we don't know any of that yet. And just to be clear, this issue absolutely was not before the district court. Preemption was barely before the district court, but no one articulated the legislation. I read the government's argument as one that was not made below. It was not. The argument made below was a more broad one, that federal law filled the field and that therefore California couldn't act. The government's argument is a more narrow one, which is that with respect to sharks lawfully taken, there might be a preemption issue. That is correct, Your Honor. And to the extent that preemption was raised, it was, frankly, raised as a defensive move by defendants to say, we can't tell what you're asserting here. Here are all the possibilities. And I meant to ask your opponent a question about that. There's some suggestion that the preemption arguments really weren't advanced very strenuously to the district judge. The judge said, are you raising a preemption argument? And I think the answer was less than clear. But the judge did rule on preemption eventually. So that's in front of us, isn't it? I think it's fair to say that you can look at it because the judge did rule on it. But I don't – I think it's going to be very difficult to find that a judge abused its – a court abused its discretion by not considering an argument or evidence that were not before it. So just returning briefly to some of the errors that opposing counsel has put forward, it is not the case that the Commerce Clause is violated simply because a state creates a ban or a roadblock. In fact, this Court has held and so have other circuits that bans are absolutely permissible under the Commerce Clause as long as they don't discriminate against out-of-state commerce. Given that our law only applies within California. Your law doesn't prohibit the shipping of banned fins out of California? It does. It does, Your Honor. Oh, I'm sorry. Well, it does if they're detached. Let me be more precise. Detached. You could actually ship an entire shark out of California if you wanted to sell the fin. There's no evidence in the record at the moment about whether it's feasible or practical to ship the entire shark through California into Arizona. There's no evidence in the record about its feasibility. The Department of Fish and Wildlife also has not yet interpreted the regulation, so we don't yet know if it's actually necessary to ship the shark in its entirety or whether it would be okay to ship the shark, for example, in parts, which might be more feasible, but with the fin obviously attached. None of this is in the record. We just don't know. I assume you'll find it in the record at the trial. I assume that we will, yes. And again, sort of touching on that, issues such as preemption and the preemption argument, this case eventually will go back and it will be tried on the merits. And I do think that would be a more appropriate place to consider arguments about preemption in the first instance with a fully developed factual record before the district court. And there will be an opportunity for that to happen. The district counselor. Has there been a trial date set yet? No, Your Honor. The case has actually stayed pending appeal. Great minds think alike here, or at least minds think alike. One of the things that always troubles me about these preliminary injunction cases is the injunction was entered how long ago? January the 2nd, 2013. So that, you know, had there been no stay, we probably would have had this case tried by now. But we do come at this at a preliminary stage of the case. Yes. And you expect that it would be a full-blown trial on the merits no matter what we do? I think if this case proceeds as it has done, yes, I expect that there would be a full trial on the merits. Depending on what you do, the district court decides to dismiss it. Again, that's all speculation. With respect to equal protection, there's absolutely no abuse of discretion. There's simply no failure in the district court's analysis. The district court, as I believe the panel has suggested, looked at all of the evidence. Very minimal evidence. And in order to show that, you know, a facially neutral law is actually discriminatory and that strict scrutiny should apply, there is evidence that can be put forth that's set forth in Arlington Heights, the type of showing that plaintiffs would have had to have made. Here you have a few out-of-context statements, only two by actual members of the legislature, the rest, you know, by the executive director of WildAid. And frankly, plaintiffs have mischaracterized those statements. It is true that Assemblyman Fong, who was a co-sponsor of the bill, referenced Chinese-Americans. He himself is Chinese-American. He has actually submitted a declaration explaining that all that he meant was that cultural practices frequently have to evolve, you know, in the face of sort of overwhelming ecological consequences as there are here. There is no evidence anywhere that the legislature enacted the shark fin prohibition for any other purpose than to stop finning and to protect the health of the oceans and the public health and safety. It targets the practice of finning. It does not target any subgroup or group of people. And plaintiffs have made no showing otherwise. It certainly has a disparate impact. The question of whether it has intent is a totally different question from impact. It is, Your Honor, and it's a dispositive question. Impact is, of course, relevant to a showing of discriminatory purpose. But standing on its own, the Supreme Court has been very clear. It's insufficient. Here, it's difficult to actually evaluate disparate impact because, of course, not all Chinese-Americans and, in fact, only a minority of Chinese-Americans actually want to use shark fin. Nevertheless, it has a disparate impact on Chinese-Americans. Not too many other people use shark fins for soup or food. So the defect is on Chinese-Americans. It doesn't have to be on all Chinese-Americans. Kagan. No. The people upon whom it has an effect are Chinese-Americans. I think we can accept that as true. That's not the case. The district court actually found that. Yes. The district court found that. And I think it's fair to say that it will have a disparate effect on the subgroup of Chinese-Americans who want to use shark fin for any reason. And I don't doubt that it's difficult not to be able to use shark fin for cultural practices. But in order to prove discriminatory purpose, you need to show, of course, that the legislature enacted the ban because it would have that disparate effect on this subgroup, not in spite of it. And here, it's clear that the legislature understood that, yes, it would probably have a disproportionate effect on the subgroup of Chinese-Americans, but that there were bigger reasons, such as protecting the environment and the public health and safety, to go ahead and enact the ban anyway. Simply, as I've said, no proof whatsoever of any animus in the record. This has never happened to me before, but unless the panel has any other questions. You were trying to save five minutes. I was, and I've saved seven. Unless the panel has any other questions for me in particular, I think I will yield the rest of my time. Thank you. Thank you. Good morning. May it please the Court. I'm Ralph Henry, and together with co-counsel Bruce Wagman, I represent the intervener defendants, Humane Society of the United States, Monterey Bay, Aquarium Foundation, and Asian Pacific Americans for Ocean Harmony Alliance. I will do my best in my limited time not to duplicate the State's presentation, and so in that accord, I will start by addressing some preemption issues. I think first and foremost, I know we've mentioned this, and I know Judge Hurwitz mentioned this as well, but I think it's absolutely clear that the presentation that the defendants made in the district court is not the same as is being presented by the federal government. It's amicus brief. In the district court, the only presentation made as preemption was in the defendant's opening brief, and there they spent three sentences discussing it and cited one authority, and that authority was an express preemption case. It had nothing to do with conflict preemption. What effect do you think that has on what we should do in this case on the preliminary disjunction? On these legal questions of the Dormant Columnist Clause preemption, should we act as if because they weren't raised in the district court as far as pure legal questions, that we shouldn't consider them here? Or should we consider them as if they had been raised? I think the short answer is no. It shouldn't be considered here, and that's because while questions of law are reviewed de novo, the entire standard of review for issuance of a preliminary injunction or denial thereof is an abuse of discretion standard, and the court is limited. To use an abuse of discretion is when the court makes an error of law. So it's a – those are rather odd words, but courts, when they have to get out of a difficult problem, make rules like that. But it's impossible for a court to make an error of law when it didn't actually consider the principle of law. Let's assume – and I don't think they've done it – but let's assume the government came to us with just a slam-dunk argument. The district court forgot about the U.S. Supreme Court case that demonstrates that this is an unconstitutional law. Surely we would consider that, wouldn't we? I think that the answer – We wouldn't continue a preliminary injunction in effect that we thought was unconstitutional. I think that the answer – and I think we're going a place that this case is not presently at – Right. My answer would be that the court should remand that for a further hearing. So it – but should keep – so somebody comes to us and demonstrates conclusively that a preliminary injunction is inappropriate because it's wrong. We should keep it in effect and send it back to the district judge and tell her, you know, we think you goofed, but we're going to keep the preliminary injunction in effect until you're convinced you goofed? Not if it's clear that it's wrong. Well, that's my – that's my point. I guess – I guess I'd like to know why it is that the government's argument is one of the variety that we ought to say, consider it on remand but not now. Well, I don't think that it's anywhere near clear that this is wrong. First, I don't think that the government's argument is meritorious at all. And at best, it raises substantial questions as to preemption with respect to, as the government puts it in footnote 4 of its amicus brief, the first sale by a fisherman. The government specifically indicates that it has not yet contemplated for one reason or another the scope of the preemptive effect of its position that it's newly articulated with respect to downstream activities from fishermen. And importantly, the plaintiffs here are not fishermen. So the government's position, even if fully accepted by the court – Nobody – nobody in this case is – the inability to land – to market legally landed charges. So even if there was preemption, it's axiomatic that the court, in finding preemption, would have to narrowly tailor a remand order with respect to, if possible, severing out or separating out the preempted sections of the law or implementation of the law. And here the government has said – and again, I don't want to get into this too far because I don't think the government's position is really properly before the court – but the government has said all we think is that the first sale by fishermen should be allowed. That kind of – a ruling that that is correct would not result in any benefit to the plaintiffs here. And as I read the government's brief, it's a little bit narrow. What the government says is here's our position. It took us a long time to come to it because we've been consulting and doing what governments do. But we just want to make sure that in ruling on this preliminary injunction, you don't do anything to prejudice our ability to make this argument later because we're afraid that if you rule broadly, we won't have had a chance to make this argument. Is that a fair reading, what the government's saying? I think that's a fair reading of the government's intent. I think it's unfortunate that in the context of this open rulemaking process where the government is proposing changes to actual regulatory savings clauses that the government has seemed to have staked out a bit more of a position in the brief filed. But I think the government's intent is clear beginning and end of their brief that their brief is being submitted to urge restraint by the court with respect to the preemption issue. And if anything, what it suggests, and I don't think it does, as noted in our responsive brief, if anything, it suggests that maybe there's a more substantial question as to preemption than has been presented in the district court in the context of an argument where the term conflict preemption was raised and express preemption case was cited and then there was no discussion before the court whatsoever. And I think it's important to reiterate that the MSA, the Madison-Stevens Act, excuse me, the federal fisheries law, does not create or guarantee a market. In fact, in our briefs, we noted very clearly that there are... the federal government does not have police powers generally. And there are limited grants of authority in the Madison-Stevens Act for the federal government to regulate sale downstream of landing. And we don't think those are appropriate here. It's certainly not the case that the federal government's authority is exclusive after the point of landing. And so to get to a question that was asked before with respect to what happens if all the states kind of jumped on board here. It's true that several states have started to enact these laws. But they're the states that have local markets for shark fins. Where there's not local markets for shark fins, you don't see these bills popping up. And that's because it's a traditional exercise of state authority to regulate products, downstream products. And if the federal government's position here, this nebulous and broad obstacle preemption position is accepted, then states could never regulate the sale of wildlife parts and products. And so laws like California's ban on the sale of elephant ivory or laws on the ban of bear gall and biles, those would be disallowed if the federal government could in the face of an absence of any congressional intent in terms of express preemption, field preemption. If the federal government can simply say in the face of silence in the federal law, a federal agency can say, well, we want, we want to leave open our ability to regulate this even though the statutory and current regulatory scheme does not on its face prevent states from doing this traditional exercise of state governance. I think that would be too broad a reading of obstacle preemption. I just want to turn to one more issue because I think, again, this presentation covered the issues with respect to the merits of the equal protection. Hold your time. We can give you... Well, let me just say that I think that under NRDC v. Winter, it's absolutely clear that irreparable harm is an irreducible minimum to issuance of a preliminary injunction. And I think it's also clear that... Did the district court make an express finding on irreparable harm? Yes, the district court said that there was no irreparable harm because as to financial harms, they were merely losses of revenue. And with respect to the unsubstantiated business injuries, so-called business injuries, citations to two declarations of individuals that said that I will eventually lose my business, those kind of speculative statements can't support a stay pending trial when it's not clear that they would lose any portion or all of their business during the case. And then with respect to the cultural harms, the district court pointed out that, yes, there are these cultural harms that are tied up in these constitutional claims, but that other Asian American citizens of California including my clients, members of my client, the Asian Pacific American Ocean Harmony Alliance, are advancing... were advancing interests in support of cultural values, Chinese traditional cultural values of normalizing human behavior to be in accord with nature that is sort of balanced out there and that implementation of this law actually favors. And then the court also went into the public interest in having this law implemented immediately and the legislative findings as to the urgency of the plight of sharks. So I think the district court very clearly said as to the balance of the equities, this should not issue. Let me ask you two questions. How long has your organization been in effect? Since the 1950s. Excuse me, my organization being the Humane Society of the United States, Monterey Bay... No, no, I meant the last group you alluded to. Oh, the Asian American... Asian Americans of Ocean Harmony Alliance. They've only been in effect for, I think, four years, somewhat more recently. The second question I have is you said business won't go out of effect immediately. It would do it over a period of time. So there shouldn't be a preliminary injunction. Now, it'll be, I assume from what you said, it'll be at least a year before the trial's over and certainly before an appeal is completed. But let's say it's about a year before the trial's over. Do you think it's not irreparable injury if they sink into bankruptcy over a period of a year? It might be under this circuit's precedent, but the problem is not one of law. The problem is one of fact. The only evidence in the district court record of these business injuries that are not merely loss of revenues is that the excerpts of record 165 and 233 they were the statements in the declarations of two importers that said I will ultimately lose my livelihood entirely. They don't specify when. They don't substantiate those statements and that's what the district court keyed in on. The district court said, I think it's page 13 of the ruling which was the excerpt of the record. Those are unsubstantiated. They did say they lost, what, $300,000? But those are mere losses of revenue and that's distinct under this circuit's precedent from actual loss of your business opportunity, bankruptcy, something like that. All right. Thank you. Thank you. There's a few  I need to make. One is that the government's position was not simply an advisory position. Their position was, at any point, that the government had a serious question to the merits had been raised, which is what and that there was the analysis by the district court was incorrect and I believe that's what the court needs to focus on. As to the issue of was, you know, is it speculative regarding moving sharks, regarding how this affects fishermen, there were declarations in the record from fishermen that said, this is destroying my business, this is harming my business. Those declarations went to taking sharks in general. They went to this bans effect. Right, but the government's argument, which you started with, is narrower, which is that there are certain sharks that under the Magnuson Act can be taken. And these were federal waters. These are the fishermen that the government's talking about. And in the record they said, this is destroying my business, harming my business. Are they parties to the suit? I don't think they need to be parties to the suit, but they aren't. But that information is in the record. But my question is, when we look at the issue of irreparable harm, can we look at irreparable harm to those who are not parties to the suit? Well, the irreparable harm is that they aren't making the sale to my clients and the appellants who want to purchase them. So, as the court itself said in its order, these fishermen serve the Chinese community. That's there. They're tied into that. But let me ask the question again. Let me try to make it more narrow. Let's assume that these fishermen are suffering irreparable harm from the California ban. Should we enjoin the California ban in a case in which the fishermen are not parties? Do your clients have standing to raise the irreparable harm of the fishermen? The fishermen are being harmed. My clients are being harmed because they are no longer being able to wholesale those fish. So they're connected. I understand the irreparable harm argument of your clients. I'm saying do they have standing to raise an irreparable harm argument of people who are not parties to the case? I think to the extent that they connect and the extent there is a preemption issue, I think they do. And I have to address one other issue and that is that there was this issue of, you know, there's speculation and there's not much in the record, but there is a record here. And in the course decision in Shell Oil v. Greenpeace, the Court was very clear this is a preliminary injunction state. This is a snapshot. And is there enough on this snapshot? And here I think clearly there's enough facts on this snapshot. There's a misapplication of law on this snapshot. At the preliminary injunction, we keep saying hearing, but it was really tried on the declarations and the briefs, was it not? Yes, it was. There wasn't live evidence? There was no live testimony, no. So in considering this, the district court had before it a series of declarations and briefing by both the Supreme   Court. And this is my last point in terms of the equal protection claim. It was actually the court at the hearing who said I don't see any evidence, direct evidence, and this is in the record, of the legislature targeting the Chinese of saying I'm targeting the Chinese. And it was pointed out unsuccessfully that you don't have to have that and you do not have to have animus. As a matter of fact, courts have said you can have a benign motive, but if there is discriminatory intent. And lastly, what this court didn't do also was, and counsel said, disparate impact is not enough. And that is true in most cases it isn't. And here I think you have discriminatory intent as well. But there are cases on facially neutral statutes where there is a  intent. And this is the only community that this affects, both in a, not just in an economic basis, in a non-economic basis, has a singular effect on the Chinese community. And under Yick Wo and Arlington Heights and even Davis, it says, in those situations, the court does need to look and say, if that overwhelming effect is there, then it has to be seriously considered. And this court did not do that. Thank you. Thank you, counsel. The case disargued will be
judges: Reinhardt, Noonan, Hurwitz